UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

DR. SEMA ROSINBUM,

    Plaintiff,

    v.

ALEX M. AZAR, II, *Secretary,*
*Department of Health and Human Services*,

    Defendant.

Civil Action No. TDC-19-3119

**MEMORANDUM OPINION**

Plaintiff Dr. Sema Rosinbum has filed a civil action against the Secretary of Health and Human Services ("HHS") in which she has alleged that she was subjected to unlawful discrimination, retaliation, and a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17 (2018), while working at the United States Food and Drug Administration ("FDA"), a component agency of the United States Department of Health and Human Services.  Presently pending before the Court is HHS's Motion to Dismiss or for Summary Judgment, which is fully briefed.  Having reviewed the submitted materials, the Court finds that no hearing is necessary.  *See* D. Md. Local R. 105.6.  For the reasons set forth below, HHS's Motion will be GRANTED IN PART and DENIED IN PART.

**BACKGROUND**

**I.    FDA Employment**

Rosinbum, who is a Muslim, Turkish American woman, has worked at the FDA since May 2006.  Rosinbum was first employed as an Oak Ridge Institute for Science and Education ("ORISE") Fellow.  From 2009 until her departure in November 2, 2016, Rosinbum was employed

as a Staff Fellow at the General Schedule-12 ("GS-12") level in the Cellular and Tissue Therapy Branch ("CTTB") within the Division of Cellular and Gene Therapies ("DCGT"), which is part of the Office of Cellular Tissue and Gene Therapies ("OCGT").  OCGT, in turn, is part of the Center for Biologics and Evaluation Research at the FDA.

Rosinbum's first-line supervisor from the beginning of her FDA employment until March 2015 was Dr. Malcolm Moos, Jr., a Medical Officer assigned to CTTB.  From November 2015 until her removal in November 2016, Rosinbum's first-line supervisor was Dr. Kyung Sung. Rosinbum's second-line supervisor was Dr. Steven Bauer, a Supervisory Biologist in CTTB, and her third-line supervisor was Dr. Raj Puri, the Director of DCGT and OCGT.

## A.    Employment under Dr. Moos

Throughout Rosinbum's tenure at CTTB, Moos made many inappropriate sexual comments.  For example, he once stated that he would like to take an FDA high school summer intern "to bed," and he openly repeated a comment allegedly made by Moos's supervisor, Bauer, that a female colleague in the lab was a "f**ck monster."  Am. Compl. ¶¶ 11(a)-(b), ECF No. 22. Moos publicly shared with individuals in his lab that he had erectile dysfunction, and one time he commented in front of female employees, while showing his fingers with a smile on his face, that "[b]ecause of my condition I am not able to provide a pleasure to pretty ladies, but I have still awesome fingers."  *Id.* ¶ 11(d).  Moos also requested at one point that Rosinbum give him a key to her house so he could watch her have sex with her boyfriend.  On another occasion, he commented, while staring at Rosinbum's breasts, that she had a nice "pair" or "set."  *Id.* ¶ 11(f). At other times, Moos made different offensive comments about Rosinbum personally, including referring to her as a "grandma" because of her conservative style of dress, and by the name "Boomer," the name of Moos's cat that is fat and does not get along well with other cats.  *Id.* ¶

11(i). Rosinbum also alleges that Moos frequently said that women take advantage of having children to do less work than men but collect the same paycheck.

Apart from these sexually inappropriate comments, Moos also commented on Rosinbum's Muslim religion. Among his statements to her were: "If Muslims are not responsible from terrorist attack, why doesn't 'Muslim society' apologize to the US?" and "I understand not all Muslims are terrorist[s] but why are all terrorists Muslim?" *Id.* ¶ 11(h).

Throughout her tenure at CTTB, Rosinbum also experienced a pattern of inappropriate physical touching by Moos. When she first began working at CTTB, Moos repeatedly brushed up against Rosinbum's body in the laboratory workspace, and these incidents increased in frequency and pressure. Rosinbum reacted to this unwanted touching by suddenly moving away from Moos when it occurred, but after several months of these incidents, she eventually confronted Moos and requested that he stop touching her in this manner. Although Moos denied the actions, he eventually ceased the behavior.

In early 2009, after Moos became aware that Rosinbum was separating from her husband, he began to show a strong interest in interacting with Rosinbum socially, such as by asking her on several occasions to go to events with him or to dinner after work. Initially, Rosinbum, in an effort to maintain a good relationship with her direct supervisor, agreed to go to certain functions with Moos. However, after Moos made explicit his intent to engage in a romantic and sexual relationship with Rosinbum, she refused later requests to see him socially.

During a work trip to California in June 2009, Moos invited Rosinbum to his hotel room, ostensibly to drop off some bottles of wine he had purchased, but upon arriving, he opened the wine and tried to direct Rosinbum to the bed. When Rosinbum asked what he was doing, Moos responded that he knew she was going through a divorce and could give her the time she needed.

Rosinbum became upset and left the room.  During another work trip, Moos got into two minor car accidents in one day, and Rosinbum, who was a passenger in the car, sustained a neck injury that caused frequent tightness and pain in her neck and shoulders.  After this trip, Moos began coming up to Rosinbum at work and giving her unsolicited massages to her neck and shoulders, claiming that he felt bad about her injury.  Rosinbum was extremely uncomfortable with this unwanted touching.  After asking him on several occasions to stop this behavior, he eventually did.

In 2010, during Rosinbum's first Performance Management Appraisal Program ("PMAP") review, Moos inquired into Rosinbum's personal goals.  During this discussion, Rosinbum stated that she was considering becoming pregnant before it became too late, to which Moos raised his voice and stated, "You cannot be pregnant in my lab!"  *Id*. ¶ 15.  On other occasions, including during other performance review meetings, Moos repeatedly encouraged Rosinbum to attend a self-help and personal growth training workshop called the "Oneness Awakening Course" ("the Oneness Course").  Moos continued to pressure Rosinbum to take the Oneness Course during 2013, when Moos invited Rosinbum, a new ORISE Fellow named Alexa Bianchi with whom Moose had begun what appeared to other OCGT personnel to be a romantic relationship, and other female subordinates to a session of the Oneness Course that would involve an overnight trip to North Carolina.  The session was not sponsored by the FDA and appeared to be designed for stock traders.  Apprehensive about traveling with Moos and believing that the session was not work-related, Rosinbum refused to attend the course, at which point Moos began accusing Rosinbum of not getting along with others, and his attitude toward her worsened significantly.  Around this time, Moos learned that Rosinbum had become engaged to be married to her boyfriend, which further contributed to his negative behavior toward Rosinbum in the workplace.  He began isolating her,

ceasing communications with her, and withholding supervision and guidance relating to her scientific research.

In January 2014, Rosinbum had her annual performance evaluation meeting with Moos, which began at 5:00 p.m. and lasted for four hours into the night. During this session, Moos continued to attempt to coerce Rosinbum to participate in activities unrelated to her work responsibilities, and when she told him that she was not required to do anything outside of her work duties, he waved her performance evaluation form in the air and stated, "Yes, you are," implying that her failure to acquiesce would negatively impact her performance rating. *Id.* ¶ 22. When the session concluded, Moos suddenly put his arms around Rosinbum for a hug, and when Moos withdrew from his embrace, his hand brushed firmly across her left breast in what appeared to be a deliberate action. Rosinbum was shocked but did not complain out of fear that, based on Moos's statements during the session, he would retaliate against her.

In reaction to this incident and all of the past inappropriate encounters she had experienced at CTTB, on April 11, 2014, Rosinbum asked to meet with Puri to make a complaint about Moos's requests for Rosinbum to attend the Oneness Course, the consequences of her most recent PMAP evaluation, and other incidents. After this conversation, Rosinbum learned that Moos had received an email from his supervisors on June 5, 2014 advising him that he needed to keep relationships with his female staff members "professional at all times." *Id.* ¶ 23. Rosinbum believes that because the other female staff had agreed to go to the Oneness Course with Moos, it was clear to Moos that the email was in reaction to a complaint that she had made.

After the email, however, Moos continued to pressure her to attend a session of the Oneness Course, including one in North Carolina in July 2014. One month before the session, Rosinbum was assigned to represent the FDA at a scientific meeting in Boston, Massachusetts. When she

asked Moos for help in preparing her presentation, he said that he would only do so if she agreed to attend the Oneness Course.  To avoid jeopardizing her career, Rosinbum finally agreed to attend, and in doing so, she had to use her annual leave and spend hundreds of dollars of her own money to take the training.

Nevertheless, Moos's attitude toward Rosinbum continued to worsen, he continued to isolate her, and he began to manipulate her research and foster conflict between her and other staff members.  For example, CTTB had hired a new researcher named Elaine Thompson who was supposed to assist Rosinbum with her research.  When Thompson began to advocate to be the lead author on a paper about research that Rosinbum had been conducting for several years, Moos encouraged the conflict, and at one point he said in a lab meeting that he would pay to see the two women in a boxing ring fighting it out.  This incident not only humiliated and demoralized Rosinbum but also threatened her career because publishing research is a critical measure of professional scientific competence and a specific criterion for retention as a Staff Scientist at the FDA.

On July 22, 2014, Puri promised Rosinbum that she would be reassigned to a different lab. However, Rosinbum was left to continue to report to Moos until March 2015 when, without advanced notice, her laboratory workbench in Moos's lab was dismantled and moved into the hallway.  She was finally reassigned after that incident.

Moos continued to have an impact on Rosinbum's career.  Although Rosinbum had worked on a research project and paper for four years while working for Moos, Moos delayed in completing the paper and did not submit it for approval until May 2016.  According to Rosinbum, Moos drafted it in a way that would cause Puri to deny it for publication in order to interfere with her career advancement.  The paper was not published.

### B.    Employment under Dr. Bauer

Beginning on March 11, 2015, Rosinbum was temporarily reassigned to report directly to Bauer, her second-level supervisor.  During this time period, which lasted until November 20, 2015, Bauer made no attempt to supervise or advise her in her daily work.  Rosinbum was thus effectively "shut out" from the rest of CTTB.  *Id*. ¶ 29.  Though Rosinbum was able to appeal to Puri to secure approval for a proposed research project, Bauer effectively prevented her from working on the project by assigning her unrelated, non-research activities typically performed by a lab technician, not a scientist of her expertise.

When Rosinbum requested that Bauer assist her in getting her research paper published by intervening with Moos, who had stalled the publication by failing to produce revisions requested by internal reviewers such as Puri, he refused to do so.  Instead, Bauer accused Rosinbum of being disrespectful to her superiors.

Nevertheless, on November 19, 2015, Rosinbum made a presentation to a Site Visit Committee ("the Committee"), a panel of scientists from academia and outside the FDA charged with reviewing her professional performance.  The Committee subsequently recommended that Rosinbum be converted from a Staff Fellow to a GS-13 Staff Scientist.

### C.    Employment under Dr. Sung

On November 20, 2015, Rosinbum was re-assigned to report to Sung.  Sung explicitly told Rosinbum, "You were not my choice to pick to work in my lab."  *Id*. ¶ 32.  Rosinbum therefore viewed the assignment as an effort by Bauer to set her up for failure.  During this time period, Sung inaccurately reported to Bauer and Puri that Rosinbum had not been attending and presenting at lab meetings, even though Rosinbum had given three presentations and had missed only one lab

meeting due to extenuating circumstances, and other members of the lab had failed to attend multiple lab meetings and one had missed a presentation.  This criticism factored into the downgrade of Rosinbum's performance review.

Because researchers typically prepare a section of their laboratory's annual report discussing their research, at the end of 2015 Rosinbum asked for a copy of the draft annual report. Sung refused to share it with her, even though the annual report is a public document.  As a result, Sung did not include any discussion of Rosinbum's research activities in her laboratory's annual report.  Sung also failed to invite Rosinbum to career-advancing trainings and meetings and told Rosinbum that she had to make an appointment to speak with Sung, even though other colleagues met frequently and casually with Sung without such appointments.

## II.     Termination

On March 21, 2016, the Committee issued its report recommending Rosinbum for conversion to a GS-13 Staff Scientist.  On July 27, 2016, however, Bauer issued Rosinbum's annual PMAP, which gave her a downgraded performance rating based on negative reports from Sung.  According to Rosinbum, these reports were the result of management's actions of isolating her, refusing to give her meaningful assignments, failing to evaluate her written work for publication, and employing other tactics designed to create a false record of poor performance to justify her removal.

On August 4, 2016, Bauer informed Rosinbum that her expiring Staff Fellow position at the FDA would not be converted to a full-time Staff Scientist position.  Rosinbum heard from two different employees that Sung had stated that Bauer and Puri made the decision that Rosinbum would not be given permanent employee status even before Sung was hired, and that the decision was made because of Rosinbum's reporting of Moos's sexual harassment.

8

### III.     Procedural History

After her termination, Rosinbum contacted an Equal Employment Opportunity ("EEO") counselor on August 22, 2016 and filed a formal EEO complaint on December 13, 2016.  After HHS conducted an administrative investigation from February 15, 2017 until May 8, 2017, Rosinbum elected on June 27, 2017 to request a hearing and decision by an administrative judge ("AJ") of the United States Equal Employment Opportunity Commission ("EEOC").  The AJ authorized a discovery period during which the parties engaged in written discovery and conducted one deposition, of Puri.  However, Rosinbum withdrew her EEOC hearing request before the hearing was scheduled to occur, and on February 4, 2019, the EEOC issued an Order directing HHS to issue a Final Agency Decision within 60 days.

On May 30, 2019, Rosinbum filed a timely Complaint in the United States District Court for the District of Columbia.  On September 25, 2019, HHS issued a Final Agency Decision finding that Rosinbum had failed to establish that she was subjected to discrimination, retaliation, or a hostile work environment.  The case was then transferred to this Court on October 28, 2019.  In her Amended Complaint, Rosinbum asserts causes of action under Title VII for religious discrimination (Count I), sex discrimination (Count II), retaliation (Count III), and hostile work environment (Count IV).

### DISCUSSION

### I.     Motion for Summary Judgment

In its Motion to Dismiss or for Summary Judgment, HHS first asserts as a threshold matter that the Court should consider the Motion as one for summary judgment under Federal Rule of Civil Procedure 56 because there is a complete administrative record on which the Court can rely

to resolve the Motion.  Based on that record, HHS argues, there is no genuine issue of material fact, and HHS is entitled to judgment as a matter of law.

The Court must first determine whether it is appropriate to consider the Motion for Summary Judgment at this stage, before any discovery has been taken in this case.  Typically, when deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court considers only the complaint and any attached documents "integral to the complaint."  *Sec'y of State for Defense v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).  Rule 12(d) requires courts to treat such a motion as a motion for summary judgment where matters outside the pleadings are considered and not excluded.  Fed. R. Civ. P. 12(d).  Before converting a motion to dismiss to one for summary judgment, courts must give the nonmoving party "a reasonable opportunity to present all the material that is pertinent to the motion."  *Id.*  "Reasonable opportunity" has two requirements:  (1) the nonmoving party must have some notice that the court is treating the Rule 12(b)(6) motion as a motion for summary judgment; and (2) the nonmoving party "must be afforded a reasonable opportunity for discovery" to obtain information essential to oppose the motion.  *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985) (citation omitted).

The notice requirement is not onerous, requiring only that the nonmoving party be aware that material outside the pleadings is pending before the Court.  *Id.*  Here, the notice requirement is met based on the title of the Motion, as well as the Notice of Intent to File a Motion, ECF No. 23.  The reasonable opportunity requirement is more demanding.  To show that a reasonable opportunity for discovery has not been afforded, the nonmoving party must file an affidavit or declaration under Rule 56(d), or a comparable filing, explaining why "for specified reasons, it cannot present facts essential to justify its opposition."  Fed. R. Civ. P. 56(d); *see Harrods Ltd. v.*

*Sixty Internet Domain Names*, 302 F.3d 214, 245 (4th Cir. 2002); *Hamilton v. Mayor & City Council of Balt.*, 807 F. Supp. 2d 331, 341 (D. Md. 2011).

HHS asserts that after Rosinbum requested a hearing and decision by an EEOC AJ, the AJ set a period for discovery during which Rosinbum made written discovery requests, including document requests and interrogatories. Although only one deposition was taken—a deposition of Puri—Rosinbum had the opportunity during this discovery period to conduct depositions of other FDA witnesses. So even though Rosinbum withdrew her request for an EEOC hearing and decision, HHS argues that the administrative record, including affidavits of various HHS supervisors and employees obtained during the administrative investigation and the discovery obtained during the EEOC discovery period, provides a sufficient record for the Court to rule on the issue of summary judgment.

Rosinbum, however, has submitted a Rule 56(d) affidavit in which she asserts that the present record is inadequate to allow her to properly oppose the Motion for Summary Judgment. Rule 56(d) requests for discovery before consideration of summary judgment are "broadly favored and should be liberally granted because the rule is designed to safeguard non-moving parties from summary judgment motions that they cannot adequately oppose." *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 281 (4th Cir. 2013) (citations omitted). Although Rosinbum acknowledges that documents and interrogatories were exchanged during the discovery before the EEOC and that Puri has been deposed, she asserts that by the time she withdrew her hearing request, discovery was "far from complete." Rosinbum Aff. at 1, Opp'n Mot. Dismiss Ex. 3, ECF No. 31-1. In particular, despite the fact that the FDA managers and supervisors central to her case provided affidavits during the administrative investigation, none have been deposed, so Rosinbum has not yet had any opportunity to test the

credibility, motivations, or mindsets of key witnesses such as Moos, Bauer, and Sung in an adversarial setting.

Such depositions are necessary to afford Rosinbum a fair opportunity to oppose the Motion for Summary Judgment.  Depositions are needed because in their absence, a plaintiff has had "no means of ferreting out inconsistencies or falsehoods in the statements of her alleged harassers." *Hart v. Lew*, 973 F. Supp. 2d 561, 574 (D. Md. 2013).  "Cross-examination is particularly valuable where, as here, a case turns on the motives and intentions of those alleged of wrongdoing," and "[i]t is only by subjecting a witness to the rigors of cross-examination that a plaintiff, and eventually a factfinder, can assess the credibility of those who disclaim any improper motivations." *Id.* (declining to convert a motion to dismiss to a motion for summary judgment because although there was an extensive administrative record, the administrative proceedings were not conducted in an adversarial context and depositions had not yet occurred); *cf. Goldberg v. Kelly*, 397 U.S. 254, 269 (1970) ("In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses.").

Although Rosinbum had an opportunity to conduct depositions during the EEOC discovery period, she elected instead to withdraw her request for a hearing and decision by the EEOC, to accept an HHS Final Agency Decision without full discovery, and to pursue this dispute in federal court.  HHS has cited no authority stating that such a decision, which is within the rules for the processing of a federal EEO complaint, precludes Rosinbum from receiving discovery in her federal civil action.  She therefore should not be denied the opportunity to use the discovery provisions of the Federal Rules of Civil Procedure to supplement the record before adjudication of the merits of her case.  Accordingly, the Court will not treat the Motion as one for summary

judgment, will construe it as a Motion to Dismiss under Rule 12(b)(6), and will not consider the attached exhibits and record evidence submitted by HHS.  *See* Fed. R. Civ. P. 12(d).

## II.     Motion to Dismiss

Although HHS seeks dismissal under Federal Rule of Civil Procedure 12(b)(6), its analysis focuses on summary judgment and largely relies on the submitted evidence that the Court may not consider.  Notably, HHS does not analyze the allegations in the Amended Complaint alone and specifically articulate how they are insufficient to state a plausible claim for relief.  Nevertheless, HHS arguably seeks dismissal under Rule 12(b)(6) of the allegations in the Amended Complaint without consideration of the submitted evidence on the following grounds:  (1) Rosinbum's hostile work environment claim fails because the claim is time-barred and the allegations do not establish that Moos's actions can be attributed to HHS; (2) Rosinbum has not properly alleged claims of sex discrimination or religious discrimination because she has not asserted that she was performing her job satisfactorily and that she was treated differently than other similarly situated personnel outside the protected class; and (3) Rosinbum's retaliation claim cannot succeed because she has not properly alleged a causal connection between protected activity and her termination.

### A.     Legal Standard

To defeat a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  Legal conclusions or conclusory statements do not suffice.  *Id.*  The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual

allegations in the light most favorable to the plaintiff.  *Albright v. Oliver*, 510 U.S. 266, 268 (1994);

*Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

A plaintiff can establish a Title VII claim through one of two methods.  As relevant here,

the plaintiff may either demonstrate through direct or circumstantial evidence that the plaintiff's

membership in a protected class or participation in protected activity motivated the employer's

adverse action, or the plaintiff may proceed through the framework established in *McDonnell*

*Douglas v. Green*, 411 U.S. 792 (1973).  *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d

277, 284-85 (4th Cir. 2004) (applying *McDonnell Douglas* to discrimination claims); *EEOC v.*

*Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005) (applying *McDonnell Douglas* to

retaliation claims).   Under the *McDonnell Douglas* framework, (1) the employee must first

establish a *prima facie* case of discrimination or retaliation; (2) the burden then shifts to the

employer to articulate a legitimate, nondiscriminatory or nonretaliatory reason for the adverse

employment action; and (3) if such a showing is made, the burden shifts back to the plaintiff to

prove that the employer's stated reasons were pretextual.  *Hill*, 354 F.3d at 285;  *EEOC*, 424 F.3d

at 405.

On a Rule 12(b)(6) motion, it is not strictly necessary that a plaintiff allege sufficient facts

to establish all elements of a *prima facie* case.  *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 511

(2002) (stating that "[t]his Court has never indicated that the requirements for establishing a prima

facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must

satisfy" on a Rule 12(b)(6) motion); *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir.

2010) (citing *Swierkiewicz* and reaffirming this principle in reviewing the grant of a motion to

dismiss in a Title VII case).  A Title VII complaint does not require "greater particularity" than

called for by the "ordinary rules for assessing the sufficiency of a complaint."  *Swierkiewicz,* 534

U.S. at 511 (quoting *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283, n. 11 (1976)); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569-70 (2007) (discussing how the Court's formulation of the Rule 12(b)(6) pleading standard is consistent with *Swierkiewicz*).

### B.    Hostile Work Environment

HHS argues that Rosinbum's hostile work environment claim in Count IV should be dismissed because (1) it is time-barred; and (2) Moos's alleged sexual harassment is not attributable to the agency.  A hostile work environment exists "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Boyer– Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015).  To prove such a claim, a plaintiff must show that (1) the plaintiff experienced unwelcome harassment; (2) the harassment was based on the plaintiff's race, color, religion, national origin, or age; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and to create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer.  *Baquir v. Principi*, 434 F.3d 733, 745–46 (4th Cir. 2006).

### 1.    Limitations Period

As HHS has argued, a federal employee seeking to assert a discrimination claim, including one based on sex or religion, must make initial contact with an EEO counselor within 45 days of the date of the alleged wrongdoing.  *See* 29 C.F.R. § 1614.105(a)(1) (2020).  Although Rosinbum contacted an EEO counselor on August 22, 2016, within 45 days of the August 4, 2016 notice declining to convert Rosinbum to a permanent Staff Scientist, HHS argues that the hostile work environment claim is time-barred because it did not arise within that 45-day period.

A court may consider a hostile work environment claim "so long as an act contributing to that hostile environment takes place" within the limitations period for the filing of the charge, and, if so, "the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105, 116-17 (2002). "[E]ven if most of the harassing conduct on which a plaintiff relies to establish her hostile work environment claim occurred outside the statutory period, the claim will be considered timely if *at least one act* continuing the violation occurred within the statutory period." *Guessous v. Fairview Prop. Investments, LLC*, 828 F.3d 208, 222 (4th Cir. 2016) (emphasis added).

Here, HHS acknowledges that two specific events fall within the limitations period—(1) Bauer's PMAP evaluation of Rosinbum on July 27, 2016 and (2) Bauer's notification on August 4, 2016 that he would not convert Rosinbum's fellowship into a permanent Staff Scientist position. Although HHS argues that these incidents do not count because they were not part of the alleged hostile work environment, the allegations in the Amended Complaint are fairly construed as asserting a plausible claim of a hostile work environment spanning the time period from 2009 up to and including Bauer's effective termination of Rosinbum on August 4, 2016. First, Rosinbum has alleged at least ten different occasions when Moos, her direct supervisor, made inappropriate and, at times, vulgar comments of a sexual nature to Rosinbum directly or while at the workplace. Rosinbum has also described efforts by Moos, on multiple occasions, to convince Rosinbum to engage in an inappropriate relationship with him, and that on several occasions he engaged in unwanted physical contact with parts of her body, including her chest, with the most recent incident occurring at her performance evaluation meeting in January 2014, when Moos also signaled that

he would give her a negative performance rating if she did not give in to his demand to participate in outside activities with him.

After that incident, Rosinbum complained of this pattern of harassment to Puri, but the harassment continued in other ways. Moos, who had already isolated Rosinbum and withheld supervision and guidance, effectively compelled her to attend the Oneness Course by refusing to assist her in preparing a presentation if she did not attend. He humiliated her and undermined her ability to publish research by stating that he would pay to see her and a junior researcher in a boxing ring fighting over who would be the lead author of a paper based on Rosinbum's research. In 2015, Rosinbum's laboratory workbench in Moos's laboratory was dismantled and left in a hallway without explanation.

When Rosinbum was transferred to the supervision of Bauer, the mistreatment continued. Bauer withheld advice and gave her assignments normally performed by a more junior lab technician. According to Rosinbum, Moos, with Bauer's acquiescence, undermined her ability to have her research published by delaying the writing and editing of her paper and including text designed to cause it to be rejected for publication. When Rosinbum was transferred to Sung's supervision in May 2016, Sung falsely reported that Rosinbum had not made presentations or attended meetings and prevented Rosinbum from including information about her research in the laboratory annual report. Viewed in the light most favorable to Rosinbum, as is required at this stage, these allegations support a plausible conclusion that the two most recent incidents—the July 2016 negative performance evaluation and the August 2016 decision not to retain Rosinbum— were the culmination of a continuing series of acts of harassment that began with sexually aggressive conduct by Moos and then, when Rosinbum refused to accede to Moos' propositions, with the type of intimidating, insulting, and humiliating harassment that was "sufficiently severe

or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Boyer–Liberto*, 786 F.3d at 277. Indeed, Rosinbum alleges that she learned that Sung had stated that the decision not to retain Rosinbum was the result of her reporting of Moos's sexual harassment, thus illustrating the connection between the later events and the broader hostile work environment.

Where Rosinbum has alleged a continuing hostile work environment that included at least one act occurring with the limitations period, the Court rejects HHS's claim that the hostile work environment claim is time-barred. *See Nat'l R.R. Passenger Corp.*, 536 U.S. at 117.

### 2. Attribution to the Employer

The Court also disagrees with HHS's argument that the actions of Moos cannot be attributable to the agency such that there is "some basis for imposing liability on the employer." *Baquir*, 434 F.3d at 745–46. The United States Supreme Court has explicitly stated that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). Moos was Rosinbum's direct, first-line supervisor when he engaged in the alleged sexually inappropriate conduct and other harassing acts, and the other alleged harassment was perpetrated by Bauer and Sung, who were Rosinbum's first- or second-line supervisors at the time of the incidents. The Court therefore finds that Rosinbum has alleged sufficient facts to impute liability to HHS for the alleged hostile work environment.

### C. Sex and Religious Discrimination

HHS also argues that Rosinbum has failed to state plausible claims for sex or religious discrimination. Title VII provides that "[i]t shall be an unlawful employment practice for an

18

employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Such a claim can be plausibly asserted through specific evidence of discriminatory intent, or through a *prima facie* case of sex or religious discrimination consisting of:  (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) different treatment from similarly situated employees outside the protected class.  *Coleman*, 626 F.3d at 190.  For a discriminatory termination, the requirement of a similarly situated comparator is not a necessary element of the plaintiff's claim if the plaintiff can introduce other direct or circumstantial evidence of discrimination.  *See Bryant v. Aiken Reg'l Med. Centers Inc.*, 333 F.3d 536, 545-46 (4th Cir. 2003).  Although Rosinbum appears to assert that sex or religious discrimination motivated a variety of negative interactions, HHS is correct that the only "adverse employment action" within the meaning of Title VII is the decision not to retain her as a permanent Staff Scientist.  *See Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (stating that an "adverse employment action" must have some "significant detrimental effect" such as a decrease in compensation, job title, level of responsibility, or opportunity for promotion and does not include a reassignment commensurate with one's salary level that causes "modest stress").

HHS argues that these claims fail because Rosinbum cannot show that she had satisfactory job performance at the time of the termination.  In the Amended Complaint, however, Rosinbum alleged that a separate Site Visit Committee of outside scientists and academics reviewed her performance and, in March 2016, recommended that she be converted to a permanent Staff Scientist position, only a few months before she was terminated.  This allegation is sufficient to meet this element.

HHS also argues that Rosinbum has neither alleged nor established that in failing to convert her from a Fellow to a Staff Scientist, HHS treated Rosinbum differently from other similarly situated colleagues from outside her protected class.  In the Amended Complaint, however, she alleges that one month before she was effectively terminated, she received a downgraded PMAP rating based in part on issues such as failing to attend lab meetings or give presentations, while several co-workers, including male co-workers, were treated more favorably in that they were not marked down in their PMAP evaluations even though they had missed lab meetings.  She has also alleged that Moos made several sexually discriminatory statements, such as stating that women take advantage of having children to do less work then men while receiving the same salary and objecting to Rosinbum becoming pregnant while working in his laboratory.  Finally, where Rosinbum has alleged that Moos sexually harassed her repeatedly yet she did not acquiesce to his misconduct, that Moos then sought to undermine her career including by sabotaging her ability to publish articles on her research, and that Bauer was aware of the misconduct, exacerbated rather than alleviated the harassment, then effectively terminated her, she has alleged facts supporting a plausible claim of the type of sex discrimination claim based on allegations that an employee was subject to unwelcome sexual harassment by a supervisor, that the employee rebuffed the sexual advances, and that as a result she was subjected to an adverse employment action such as termination.  *See Okoli v. City Of Baltimore*, 648 F.3d 216, 220, 222-23 (4th Cir. 2011).  *Cf. Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986) (stating that "without question, when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex").  Accordingly, at the motion-to-dismiss stage, Rosinbum has asserted a plausible claim of sex discrimination, and the Court will deny the Motion as to the sex discrimination claim in Count II.

The Court does not find, however, that Rosinbum has sufficiently alleged a claim of religious discrimination.  Although Rosinbum has identified two undated statements by Moos referencing the Muslim religion that could support an inference that Moos had a religious animus against Muslims, she has not provided allegations explaining how her eventual termination was motivated by such views, particularly when she has alleged that Moos treated her adversely only after she rebuffed his sexual advances, reported that she was getting married, declined to attend the Oneness Course, and complained about his harassment.  Most notably, she has not alleged that Bauer, the decisionmaker in her termination, either was aware of Moos's views or had such religious animus himself.  In the absence of such allegations, the Court finds that she has failed to state a plausible claim of religious discrimination.  *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 151-52 (2000) (in analyzing an employment discrimination claim, focusing the analysis on the "actual decisionmaker" behind a termination); *see also Davis v. Dimensions Health Corp.*, 639 F. Supp. 2d 610, 616 (D. Md. 2009) (granting summary judgment on a religious discrimination claim where the plaintiff acknowledged that he did not know whether the supervisor responsible for his oversight and termination "even knew whether he was a Muslim").  Thus, the Motion will be granted as to the religious discrimination claim in Count I.

### D.    Retaliation

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter."  42 U.S.C. § 2000e-3(a).  To establish a *prima facie* case of retaliation, a plaintiff must present facts that establish that (1) the plaintiff engaged in a protected activity; (2) the employer took a materially adverse action against the plaintiff; and (3) there was a causal link between the two events.  *Boyer–Liberto*, 786 F.3d at 281.  Although

HHS has not specifically argued that Rosinbum has failed to plead sufficient facts in the Amended Complaint to support a plausible claim of retaliation, *Iqbal*, 556 U.S. at 678, it argues that the evidence does not support a finding of a causal link between the protected activity she engaged in by reporting Moos's sexual harassment and her eventual termination.  Even construed as a claim that the Amended Complaint does not sufficiently allege causation, this argument fails.

Rosinbum asserts that in April 2014, she complained to Puri about Moos's ongoing misconduct, including his requests that she attend the Oneness Course, which would be an overnight, non-work-related trip with him, and the PMAP evaluation meeting, at which he engaged in unwanted physical touching and had signaled that he would condition her PMAP evaluation on compliance with his requests.  Where the result of this complaint was an email to Moos to keep his relationship with female staff "professional at all times," Am. Compl. ¶ 23, it is fairly construed as protected activity complaining of sexual harassment.  Although Rosinbum's termination did not occur until August 2016, it took place at the end of her ongoing fellowship, which ran for a total of seven years, and thus arguably occurred at the first available opportunity to remove her.  In the interim, Rosinbum has alleged that she endured additional harassment from Moos, Bauer, and Sung.  *See supra* part II.B.1.  Most importantly, Rosinbum alleges that Sung made a statement that the decision to terminate Rosinbum's employment was based on Rosinbum's reporting of Moos's sexual harassment.  The Court therefore finds that Rosinbum has sufficiently alleged causation between the protected activity and her termination as required to support a Title VII retaliation claim.  *Boyer–Liberto*, 786 F.3d at 281.  The Court will therefore deny the Motion as to the retaliation claim.

**CONCLUSION**

For the foregoing reasons, HHS's Motion to Dismiss or for Summary Judgment, construed as a Motion to Dismiss, will be GRANTED IN PART and DENIED IN PART.  The Motion will be granted as to the claim of religious discrimination in Count I of the Amended Complaint and otherwise denied.  A separate Order shall issue.


Date:  November 6, 2020                                    /s/ *Theodore D. Chuang*
                                                                  THEODORE D. CHUANG
                                                                  United States District Judge